IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHARLES CAMERON QUILLIN,<br><br>                  Petitioner,<br><br>vs.<br><br>HUNTER ANGLEA, Acting Warden,<br>Sierra Conservation Center,[1]<br><br>                  Respondent. | No. 2:15-cv-01483-JKS<br><br>MEMORANDUM DECISION |

Charles Cameron Quillin, a state prisoner proceeding *pro se*, filed a Petition for a Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254. Quillin is in the custody of the California Department of Corrections and Rehabilitation and incarcerated at the Sierra Conservation Center. Respondent has answered, and Quillin has replied.

I. BACKGROUND/PRIOR PROCEEDINGS

On September 28, 2011, Quillin was charged with the murder of his friend Matthew Smith. The information additionally alleged as an enhancement that Quillin had personally discharged a firearm during the commission of the offense and caused great bodily injury. Quillin denied the charges and enhancement and proceeded to a jury trial on April 3, 2012. On direct appeal of his conviction, the California Court of Appeal laid out the following facts underlying the charges against Quillin and the evidence presented at trial:

---

[1] Hunter Anglea, Acting Warden, Sierra Conservation Center, is substituted for Dave Davey, former Warden, California State Prison-Corcoran FED. R. CIV. P. 25(c).

A
The Prosecution's Case

[Quillin] and the victim Smith had been friends since about seventh or eighth grade. At the time [Quillin] shot Smith, [Quillin] was 21 and Smith was 22.

Smith's girlfriend was Jennifer Vietto. According to Vietto, Smith had a gun that he carried around on him all the time, and in the past [Quillin] and Smith had jokingly shot Smithss guns (he had more than one) in the open together. About a month before the shooting, [Quillin] and Smith had a "play fight" or a "friendly fade" (meaning a friendly fight) in which [Quillin's] "nose was busted open" and Smith had a "small bruise." Since then, [Quillin] and Smith had exchanged more than 190 text messages and telephoned each other about 85 times.

The night of August 26, 2011, Smith and Vietto picked up Vietto's friend, Kaitlyn Jordan, and the three of them went to [Quillin's] trailer in West Sacramento sometime after 11:30 p.m. Twenty minutes later, a friend of [Quillin's], Tim Wales, came over, too. All five of them were in the living room playing a drinking game that involved taking shots in rapid succession. For some unknown reason, [Quillin] decided he did not want to drink anymore, became mad, and went outside. Sometime after [Quillin] came back inside, Jordan vomited. [Quillin] became "very upset" and told her that she "better clean up that throw up." He "had a really mean look on his face and was fidgeting a lot." Smith asked [Quillin], "[Y]ou're going to end the party off one girl?" There was tension between [Quillin] and Smith. Wales told [Quillin], "Charlie, bro, like, you're around people [who] love you. We're not trying to do anything against you." After Jordan and Vietto left, [Quillin] and Smith argued about whether Jordan could come back. [Quillin] sounded agitated and upset. Smith was "trying to talk to him and calm him down . . . ." When Vietto came back, [Quillin] and Smith were still arguing about Jordan. Vietto asked [Quillin] why he did not like Jordan and said there was nothing wrong with her. Vietto and [Quillin] were angry with each other, so Smith broke up their argument by telling her to go to the car. At that point, [Quillin] pulled a gun out of his front pocket and pointed it at Smith's head. Smith responded, "I don't care what he has, just go to the car." By this time, Jordan and Vietto had come back inside the trailer, and [Quillin] said, "[G]et her out of here. Both of you. Get her and get the fuck out of here now." [Quillin] and Smith were within two feet of each other.

According to Wales, there was not a physical fight between [Quillin] and Smith. He never saw Smith "take a swing" at [Quillin], but Smith "might have" because "there was a period of time where [Wales] . . . [was] kind of turned . . . ." "They weren't fighting and they weren't standing there and they weren't swinging at each other or trying to bump chests." They were "[s]tepping up to each other" with "[a] little bit" of "[r]aised voices." Right after that, Wales heard a gunshot and saw Smith "falling back slowly." Wales "[go]t out of there" and heard three more shots.

According to Jordan (who was watching from Vietto's car), Smith was "talking with his hands" and "trying to get his point across" about eight feet away from [Quillin]. "And then all of a sudden, [Quillin] just stood up and shot [Smith]" while Smith was facing him. There were three or four gunshots. After the first shot, Smith's head went

2

backwards.  After the second shot, Smith "went to the ground."  There was one more shot when Smith's body went down.

Wales ran to Vietto's car, and Vietto, Wales, and Jordan drove to a nearby motel and called 911.  Police showed up, and all of them went back to the trailer.  Vietto saw [Quillin] walk up to the trailer with a big alcohol bottle in hand.  Police handcuffed him.  When police asked where the gun was, [Quillin] pointed to a location 160 feet away from the fence of the trailer.  When he was booked into the jail and told it was for attempted murder, [Quillin] responded as follows: "'So he's still alive? Oh, thank God.'"  He added, "'How can he still be alive, I put five holes in him?'"

When police arrived, Smith still had a pulse and was breathing.  He had a small gun in his pocket.  He was taken to the hospital and died of multiple gunshot wounds.  He was shot five times, twice in the head.

## B
### *The Defense*

[Quillin] testified that he and Smith were friends who hung out daily.  Smith was a Sureño gang member who had been to prison.  [Quillin] had often seen Smith with a gun.

The day before the shooting, Smith had asked [Quillin] for some bullets because Smith had "just dumped all of his bullets on some [Norteño]."  ([Quillin] had given Smith bullets in the past.)  [Quillin] told Smith he did not have enough bullets to give him, so Smith got "real mad," and [Quillin] hung up the telephone on Smith.  The next day (before Smith and the others came to [Quillin's] trailer to drink), [Quillin] gave Smith two bullets.

At [Quillin's] trailer, [Quillin] took shots of alcohol with Smith, Vietto, and Jordan and then he switched to beer.  Wales showed up later and joined the drinking.  [Quillin] went outside and sat on the porch and heard the others inside saying his name.  He told them he could hear them talking about him, to which Smith responded with attitude, "ain't no one fucking talking about you."

Around this time, Jordan threw up.  [Quillin] got her a towel for her to clean up, but she "just tossed it on the ground."  [Quillin] went into the kitchen.  [Quillin] told Jordan she "ha[d] to clean it up better than that" and then told her "just leave."  When Jordan and Vietto were leaving, [Quillin] told Vietto not to bring Jordan back.  Smith, who was also in the kitchen, as was Wales, asked [Quillin] (who was sitting in a chair), "'why are you trippin'?'"  Vietto came in and started yelling at [Quillin], "why are you fucking acting like that to my friend?"  [Quillin] told her, "you could leave too."  Smith told [Quillin], "why are you getting on my girl like that" and then told Vietto to leave.  [Quillin] was "scared of him at this point."

[Quillin] "pull[ed] the gun out of [his] pocket, and then . . . s[a]t back down."  Vietto told Smith, "he's pulling his gun out," to which Smith responded, "I don't give a fuck what he has."  Smith told Vietto to go back outside, and she did.  Smith asked [Quillin], "what the fuck are you doing," and then Smith "came charging at [Quillin]."

3

> [Quillin] stood up and told Smith, "don't come near me," but Smith "just kept coming." Smith grabbed [Quillin] "[a]round [his] neck, shoulder area."
>
> [Quillin] "pulled [the gun] up" and Smith "pushed [Quillin] back, and that's when [Quillin] shot." [Quillin] then grabbed the bottle of alcohol, took the gun with him, and called his dad because he was scared. He asked his dad to lie and "tell people that he [Quillin] was there." His dad told him to turn himself in.

*People v. Quillin*, No. C071297, 2014 WL 2738849, at *1-3 (Cal. Ct. App. Jun. 17, 2014).

At the conclusion of trial, the jury found Quillin guilty of first-degree murder and also found true the weapon use enhancment. The trial court subsequently sentenced Quillin to an aggregate term of 50 years to life imprisonment, consisting of an indeterminate term of 25 years to life imprisonment for murder and a consecutive 25 years to life imprisonment for the firearm use enhancement.

Through counsel, Quillin appealed his conviction, arguing that: 1) the court erroneously instructed the jury as to voluntary intoxication; 2) the court abused its discretion and violated Quillin's rights against self-incrimination when it ruled that it would not give a self-defense instruction unless Quillin testified; 3) the self-defense instructions as given were erroneous; and 4) the court erred in its instruction regarding jurors submitting their own questions and failed to inquire when some questions posed by jurors demonstrated bias. The Court of Appeal unanimously affirmed the judgment against Quillin in a reasoned, unpublished opinion issued on June 17, 2014. *Quillin*, 2014 WL 2738849, at *9. Quillin petitioned for review of Claims 1, 2, and 4, which the California Supreme Court summarily denied on September 17, 2014.

Quillin then timely filed a *pro se* Petition for a Writ of Habeas Corpus to this Court on April 7, 2015. *See* 28 U.S.C. § 2244(d)(1)(A).

## II. GROUNDS/CLAIMS

In his *pro se* Petition before this Court, Quillin raises the instructional error and compelled testimony claims he unsuccessfully raised in his petition for review in the California Supreme Court. First, he argues that the trial court failed to properly admonish jurors concerning the submission of juror questions and failed to make an inappropriate inquiry when some jurors submitted questions suggesting partiality. He next avers in Ground 2 that the trial court violated his right to self-incrimination when it refused to give self-defense instructions unless he testified. Finally, Quillin contends that the trial court erroneously instructed the jury on voluntary intoxication and that counsel was ineffective for failing to request the proper instruction.

## III. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2). A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the

5

relevant state-court decision." *Id.* at 412. The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts. *Early v. Packer*, 537 U.S. 3, 10 (2002). Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied). It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)). A summary denial is an adjudication on the merits and entitled to deference. *Harrington v. Richter*, 562 U.S. 86, 99 (2011). Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

IV. DISCUSSION

Ground 1.     *Jurors' Submission of Questions*

Quillin first argues that the trial court erred by failing to properly admonish the jurors when instructing them that they could submit questions to ask the witnesses[2] and failing to inquire when some jurors' questions demonstrated bias. The trial court recounted the following background to this claim:

> The instruction that defendant contends was flawed was the following, which the court gave right before the first witness testified:
>
>> "Folks, before we hear from the first witness, I want to talk about a procedure I use here in court that you don't necessarily see on TV. I let jurors ask questions of the witnesses.
>>
>> "Now, everything in a trial is formal, so you don't get to just shout out your questions. The questions have to be written out so that I get the chance to preview the questions and make sure that they call from admissible evidence and, frankly, more importantly, to make sure there's not some other witness with more information on that subject who is going to be coming in and talking about it because if so, there's no reason to ask that question.

---

[2] Notably, Quillin does not challenge the court's allowing jurors to submit their own questions. Even if he had, no United States Supreme Court case stands for the proposition that an accused's rights to due process rights or trial by impartial jury are placed in jeopardy when the trial court permits jurors to submit questions for the witnesses. *See Carey*, 549 U.S. at 77 (stating that, where Supreme Court precedent gives no clear answer to question presented, "it cannot be said that the state court 'unreasonab[ly] appli[ed] clearly established Federal law'"); *see also Alberni v. McDaniel*, 458 F.3d 860, 864 (9th Cir. 2006). Moreover, even under Ninth Circuit case law applicable on direct review, it is not reversible error for a trial court to permit jurors to submit questions for witnesses so long as the procedure for doing so was neutral and no prejudice resulted from any question asked. *United States v. Huebner*, 48 F.3d 376, 382 (9th Cir. 1994); *see also Slaughter v. Parker*, 450 F.3d 224, 237 (6th Cir. 2006) (in § 2254 case suggesting that relief would not be warranted for juror questioning absent a showing of prejudice, and also observing that no Supreme Court precedent holds that juror questioning of witnesses violates the Sixth or Fourteenth Amendments). Quillin does not allege that the process was not neutral or that the trial court received input from the prosecution but not the defense.

7

"In my experience more than ninety percent of the time jurors pose questions to the witnesses they are great questions. They cover subjects that either weren't discussed in sufficient detail or subjects that were simply missed by the attorneys.

"Sometimes, because the attorneys know more about the case than any of us, they assume that we know things we don't know, so they forget to ask questions based on those assumptions.

"You need to know everything of importance in this case, so if there's anything in the case that you are unsure of, that you think a witness may know about, don't hesitate to write out a question.

"I mean, the worst thing that can happen is I will tell you 'Sorry. We are not going to ask that question of this particular witness.'

"I will tell you if you asked a question that I think, based on what the attorneys tell me, can be more directly discussed by some other witness, I will simply tell you there's another witness who is going to come in and talk about that very subject.

"But most of the time your questions will be posed to the witness so that you will have all of the information that you need to make the important decisions that the attorneys have identified as the issues in this particular case, so I encourage you to ask questions if, indeed, you have questions.

"Now, the way that we do this is after the attorneys finish their questioning, I will turn to you, and I will ask you if you have any questions.

"Now, it may be that you were anticipating the attorneys would ask your question so you haven't written it out. That's fine. Don't worry. Just let us know that you have a question, and we will wait patiently while you write out the question.

"The bailiff will then collect everyone's questions. I will meet the attorneys at bench side, and I will review the questions with them. I will tell the attorneys whether the questions can be asked.

"If the questions are appropriate, then I will let the attorneys ask those questions. Most of the time I wouldn't ask the questions. They would ask the questions, but at least in that way you will get your questions answered."

*Quillin*, 2014 WL 2738849, at \*7-8.

Quillin claims that the instruction as given was an abuse of discretion because it "did not caution jurors not to feel slighted or disappointed if his or her question was not asked, did not tell jurors not to speculate why a question was not asked or speculate what the answer might have been, and, most importantly, did not caution jurors to keep in mind in framing their questions that they were not advocates for one side or the other." *Id.* at *8. That language appears in CALCRIM No. 106,[3] which was not given in this case.

Because jury instructions in state trials are typically matters of state law, federal courts are bound by a state appellate court's determination that a jury instruction was not warranted under state law. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (noting that the Supreme Court has repeatedly held that "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *see also Williams v. Calderon*, 52 F.3d 1465, 1480-81 (9th Cir. 1995). An instructional error, therefore, "does not alone raise a ground cognizable in a federal habeas proceeding." *Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1986) (citation omitted).

A challenged instruction violates the federal constitution if there is a "reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 380

---

[3] That instruction states: "If, during the trial, you have a question that you believe should be asked of a witness, you may write out the question and send it to me through the bailiff. I will discuss the question with the attorneys and decide whether it may be asked. Do not feel slighted or disappointed if your question is not asked. Your question may not be asked for a variety of reasons, including the reason that the question may call for an answer that is inadmissible for legal reasons. Also, do not guess the reason your question was not asked or speculate about what the answer might have been. Always remember that you are not advocates for one side or the other in this case. You are impartial judges of the facts." CALCRIM No. 106.

(1990). The question is whether the instruction, when read in the context of the jury charges as a whole, is sufficiently erroneous to violate the Fourteenth Amendment. *Francis v. Franklin*, 471 U.S. 307, 309 (1985). This Court must also assume in the absence of evidence to the contrary that the jury followed those instructions. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (noting the "almost invariable assumption of the law that jurors follow their instructions"); *see Francis*, 471 U.S. at 323-24 & n.9 (discussing the subject in depth).

It is well-established that not only must the challenged instruction be erroneous but it must violate some constitutional right, and it may not be judged in artificial isolation but must be considered in the context of the instructions as a whole and the trial record. *Estelle*, 502 U.S. at 72. This Court must also bear in mind that the Supreme Court has admonished that the inquiry is whether there is a reasonable likelihood that the jury applied the challenged instruction in a way that violates the constitution and that the category of infractions that violate "fundamental fairness" is very narrowly drawn. *Id.* at 72-73. "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process clause has limited operation." *Id*. Where the defect is the failure to give an instruction, the burden is even heavier because an omitted or incomplete instruction is less likely to be prejudicial than an instruction that misstates the law. *See Henderson*, 431 U.S. at 155. In those cases, the inquiry is whether the trial court's refusal to give the requested instruction "so infected the entire trial that the resulting conviction violates due process." *See id.* at 156-57; *Estelle*, 502 U.S. at 72. Moreover, even if the trial court's failure to give the instruction violated due process, habeas relief would still not be available unless the error had a "substantial and injurious effect or influence in determining the jury's

verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *California v. Roy*, 519 U.S. 2, 5 (1996).

Under these guidelines, the Court cannot find the state courts' rejection of Quillin's claim unreasonable or contrary to Federal law. As an initial matter, even if the court abused its discretion, that fact would not warrant federal habeas relief. Although the Ninth Circuit has suggested that an abuse of discretion may also amount to a constitutional violation, *see Schell v. Witek*, 218 F.3d 1017, 1025 (9th Cir. 2000) (en banc), the Supreme Court has never held that abuse of discretion is an appropriate basis for granting federal habeas relief.[4] Indeed, quite to the contrary, the Supreme Court has strongly suggested that, while abuse of discretion is an appropriate standard on direct review, in a federal habeas proceeding it is not. *Renico v. Lett*, 559 U.S. 766, 772-73 (2010) ("It is not even whether it was an abuse of discretion for her to have done so–the applicable standard on direct review. The question under AEDPA is instead whether the determination of the Michigan Supreme Court that there was no abuse of discretion was "an unreasonable application of . . . clearly established Federal law."" (quoting § 2254(d)(1))).

Moreover, an independent review of the instruction, as given, supports the Court of Appeal's conclusion that the concerns addressed by CALCRIM No. 106 were adequately covered by the court's instruction. As the Court of Appeal reasonably concluded:

---

[4] At one time, the Ninth Circuit viewed a state court ruling to be "objectively unreasonable" if it amounted to a clear error. *Van Tran v. Lindsey*, 212 F.3d 1143, 1152-54 (9th Cir. 2000). This is the test the Ninth Circuit uses in reviewing a trial court decision under the abuse of discretion standard. *United States v. Ressam*, 679 F.3d 1069, 1086 (9th Cir. 2012) (en banc). The Supreme Court noted *Van Tran's* statement of the test and expressly rejected it as inappropriate under the AEDPA. *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003) (clear error standard is insufficiently deferential to state courts).

> Contrary to [Quillin's] argument, however, the court effectively addressed these concerns, which we determine by looking at the instructions as a whole. With respect to cautioning the jurors not to feel slighted or disappointed if their questions were not asked, the court said the functional equivalent by instructing "the worst thing that can happen is I will tell you 'Sorry. We are not going to ask that question of this particular witness.'" With respect to not speculating why a question was refused or not speculating what the answer might have been, the court had just explained in an earlier instruction in the context of a question that was asked but an objection sustained, "do not guess what the answer might have been or why I ruled as I did." There is no reason to believe that the jurors would not have applied this same logic or instruction to a question they asked that the court refused to read. Finally, with respect to cautioning jurors to keep in mind in framing their questions that they were not advocates for one side or the other, the court had already instructed "[k]eep an open mind throughout the entire trial" and "[d]o not make up your mind about the verdict or any other issue until after you have discussed the case with the other jurors during deliberations" and "not [to] let bias, sympathy, prejudice, or public opinion influence your decision."

*Quillin*, 2014 WL 2738849, at *9 (citation omitted).

Because a fair reading of the instructions in their entirety supports that Quillin's concerns were adequately covered, Quillin fails to show that the trial court erred, much less that the instructions as given "infected the entire trial," *Henderson*, 431 U.S. at 155, or had a "substantial and injurious effect or influence in determining the jury's verdict," *Brecht*, 507 U.S. at 637. Quillin's instructional error claim therefore must fail.

Quillin fares no better with respect to his related claim that the trial court failed to investigate when some of the jurors' questions demonstrated bias. According to Quillin, five questions that certain juror submitted showed that those jurors were no longer functioning in the role of impartial judges of the facts, and the trial court had a duty to investigate whether there was good charge to discharge those jurors. But because the state appellate court found Quillin's claim forfeited under California's contemporaneous objection rule, *Quillin*, 2014 WL 2738849, at *9, the claim is procedurally defaulted from federal habeas review, *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991). The Ninth Circuit has repeatedly recognized and applied the

12

California contemporaneous objection rule in affirming denial of a federal habeas petition on grounds of procedural default where there was a complete failure to object at trial. *See, e.g.*, *Inthavong v. Lamarque*, 420 F.3d 1055, 1058 (9th Cir. 2005); *Paulino v. Castro*, 371 F.3d 1083, 1092-93 (9th Cir. 2004). Because the state appellate court held that the claim was forfeited under California's contemporaneous objection rule, the claim is procedurally defaulted and thus without merit on federal habeas review as well.[5]

Ground 2.    *Compelled Testimony*

Quillin next contends that the trial court violated his right against self-incrimination when it refused to give a self defense instruction unless Quillin testified. The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." *Minnesota v. Murphy*, 465 U.S. 420, 426 (1984). However, as the Supreme Court has acknowledged:

> [t]he [Fifth] Amendment speaks of compulsion. It does not preclude a witness from testifying voluntarily in matters which may incriminate him. If, therefore, he desires the protection of the privilege, he must claim it or he will not be considered to have been "compelled" within the meaning of the Amendment.

*Murphy*, 465 U.S. at 427 (quoting *United States v. Monia*, 317 U.S. 424, 427 (1943)).

The record here reflects that Quillin took the stand voluntarily after having been advised that he had the constitutional right not to do so, and thus was completely voluntary. To the extent that he felt obliged to testify in order to obtain a lesser-included-offense jury instruction, that fact does not amount to compulsion under the Fifth Amendment. *See Ohio Adult Parole Authority v. Woodard*, 523 U.S. 272, 286 (1998) ("A defendant whose motion for acquittal at the

---

[5] Quillin did not allege on direct appeal, and does not allege here, that trial counsel was ineffective for failing to request that the court conduct an inquiry into the jurors' responses.

close of the government's case is denied must then elect whether to stand on his motion or to put on a defense . . . . In each of these situations, there are undoubted pressures—generated by the strength of the government's case against him—pushing the criminal defendant to testify. But it has never been suggested that such pressures constitute 'compulsion' for the Fifth Amendment." (internal citation omitted)).

To the extent that Quillin claims he is entitled to relief because the trial court committed error or otherwise abused its discretion under state law with respect to the jury instructions, such claim raises only issues of state law that are not cognizable in a federal habeas corpus proceeding. Moreover, a review of the record in the instant case reveals no error, much less due process violation, in the trial court's refusal to given the instruction when initially requested because there was insufficient evidence to support them at that time. *See Solis v. Garcia*, 219 F.3d 922, 929-30 (9th Cir. 2000) (no due process violation arises from the failure to instruct the jury on a lesser included offense where the requested instruction is not supported by the evidence). As the Court of Appeal reasonably explained:

> Here, the court was correct that at the time defendant initially requested self-defense and imperfect self-defense instructions, there was insufficient evidence to support them. As the court explained, at the time defense counsel initially requested the self-defense and imperfect self-defense instructions, the evidence was that [Quillin] and Smith had gotten into an argument, [Quillin] pointed a gun at Smith, and then fired five times. There was no eyewitness testimony, statement at the time of the crime, or some behavior that manifested his intent explaining why [Quillin] pulled the trigger.
> What this evidence showed was that [Quillin] was mad, angry or agitated throughout the evening, becoming more so after Jordan vomited. Smith tried to diffuse the situation, and when they were within feet of one another, they "[s]tepp[ed] up to each other" with "[a] little bit" of "[r]aised voices" and Smith made some hand gestures to get his point across. But there was no evidence at this point that Smith swung at [Quillin], threatened him, or did anything that caused [Quillin] to feel like he was in fear "of imminent danger to life or great bodily injury."
> What [Quillin] points to is the following background evidence about Smith: according to Vietto, Smith had a gun that night, carried a gun on him "at all times," and

> in the past [Quillin] and Smith had jokingly shot their guns in the open together; and about a month before the shooting, [Quillin] and Smith had a "play fight" in which [Quillin's] "nose was busted open" and Smith had a "small bruise." The problem with this evidence is [Quillin] points to no evidence at the time the court rejected the instructions that [Quillin] knew that Smith carried a gun at all times or he knew that [Quillin] had a gun on him that night and there was no indication why the play fight would have made [Quillin] think Smith would be violent here.
>
> In summary, at the time the court ruled it would not give the self-defense or imperfect self-defense instructions, there was insufficient evidence that [Quillin] was in fear "of imminent danger to life or great bodily injury." The court was correct to refuse the instructions at this time.

*Quillin*, 2014 WL 2738849, at *5-6 (citation omitted).

The determination of the Court of Appeal is both reasonable and fully supported by the record. Consequently, the Court of Appeal's rejection of this instructional error claim is neither contrary to nor an unreasonable application of federal law, and Quillin is not entitled to federal habeas relief on the claim either.

Ground 3.      *Voluntary Intoxication Error/Ineffective Assistance of Counsel*

Finally, Quillin contends that the jury instruction on voluntary intoxication erroneously precluded the jury from considering Quillin's intoxication on any issue but specific intent to kill and that trial counsel was ineffective for acceding to the defective instruction. According to Quillin, the trial court should have instructed the jury that voluntary intoxication could be used to negate premeditation and deliberation, and defense counsel was ineffective for failing to request that pinpoint instruction. The California Court of Appeal considered and rejected this claim on direct appeal as follows:

> [Quillin] contends the court violated his due process right to present a complete defense by failing to instruct that voluntary intoxication could be used to negate premeditation and deliberation. We hold [Quillin] has forfeited the issue by failing to request that pinpoint instruction and [Quillin's] backup ineffective assistance argument fails because there was no prejudice.
> The court instructed on voluntary intoxication as follows:

15

"You may consider evidence, if any, of [Quillin's] voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether [Quillin] acted with the specific intent to kill.

"A person is voluntarily intoxicated if he or she becomes intoxicated by willingly using any intoxicating liquor, drug, or other substance knowing that it could produce an intoxicating effect or willingly assuming the risk of that effect. You may not consider evidence of involuntary [sic] intoxication for any other purpose."

Evidence of voluntary intoxication is "admissible solely on the issue of whether or not [Quillin] actually formed a required specific intent, or, when charged with murder, whether [Quillin] premeditated, deliberated, or harbored express malice aforethought." (Pen. Code, § 29.4, subd. (b).) The trial court does not have a duty to instruct sua sponte that the jury could consider voluntary intoxication evidence with respect to the issue whether [Quillin] premeditated and deliberated. "As [the California Supreme Court] explained in *People v. Saille* (1991) 54 Cal.3d 1103, 1120 . . ., an instruction on voluntary intoxication, explaining how evidence of a defendant's voluntary intoxication affects the determination whether defendant had the mental states required for the offenses charged, is a form of pinpoint instruction that the trial court is not required to give in the absence of a request. [Citation.]" (*People v. Bolden* (2002) 29 Cal.4th 515, 559.)

In *Saille*, the defendant was convicted of the first degree murder of one victim and the attempted murder of another victim. (*People v. Saille*, *supra*, 54 Cal.3d at p. 1107.) "[T]he instructions given (CALJIC No. 4.21) related voluntary intoxication only to the question of whether defendant had the specific intent to kill." (*Saille*, at p. 1117.) The defendant contended that "the trial court erred in failing to instruct sua sponte that the jury should consider his voluntary intoxication in determining whether he had premeditated and deliberated the murder." (*Ibid.*) The Supreme Court held that an instruction that relates the evidence of the defendant's intoxication to an element of a crime, such as premeditation and deliberation, is a pinpoint instruction, which the defense must request, and not a "'general principle of law,'" upon which a trial court must instruct sua sponte. (*Id.* at p. 1120.) It concluded that the trial court did not err. (*Ibid.*)

Here, defense counsel did not request a pinpoint instruction relating voluntary intoxication to premeditation and deliberation. Following *Saille*, we hold that the trial court did not err in failing to give such an instruction that covered premeditation and deliberation.

We turn then to [Quillin's] backup argument, which is that defense counsel was ineffective for failing to request a pinpoint instruction relating the voluntary intoxication instruction to premeditation and deliberation. We reject [Quillin's] argument because there was no prejudice. (*See People v. Gates* (1987) 43 Cal.3d 1168, 1183) [to show ineffective assistance of counsel, a defendant must show that counsel failed to act as a reasonably competent attorney, and that prejudice resulted (*i.e.*, a reasonable probability that defendant would have fared better had counsel not failed).]

The jury was properly instructed on voluntary intoxication as it related to [Quillin's] ability to form the specific intent to kill. By finding [Quillin] guilty of murder, the jury rejected the theory that he was so intoxicated that he did not form the

16

> specific intent to kill. It is inconceivable that the jury would have found that he could form the specific intent to commit the crime but determine, based on the same intoxication, evidence that he was too intoxicated to premeditate and deliberate. (*See People v. Cain* (1995) 10 Cal.4th 1, 45 [inconceivable that jury would find that the defendant did not form specific intent to rape based on intoxication when it determined that the same intoxication evidence did not negate the specific intent to kill].) Furthermore, right after the shooting, [Quillin] was able to discard his firearm about 160 feet away from the fence of the trailer and call his dad to ask him to be his alibi. These were not the actions of a man who was too intoxicated to premeditate and deliberate a murder just a few minutes earlier. Therefore, there was no prejudice in defense counsel's failure to request the pinpoint instruction.

*Quillin*, 2014 WL 2738849, at *3-4.

Quillin's claims relating to the voluntary intoxication instruction also must fail on federal habeas review. First, as previously discussed, a federal court "will not review questions of federal law decided by a state court if the decision also rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman*, 501 U.S. at 729-30. As aforementioned, the Ninth Circuit has recognized and applied California's contemporaneous objection rule in affirming denial of a federal petition on grounds of procedural default where there was a complete failure to object at trial. *See Paulino*, 371 F.3d at 1092-93 (state appellate court's conclusion that trial counsel's consent to jury instructions at trial was a clear and express waiver, and thus defendant's federal claim challenging any instructions was procedurally barred). Similarly, this Court is bound by the California law enunciated in *Saille* that such pinpoint instruction must have been requested, and thus the Court cannot find unreasonable the Court of Appeal's determination that the trial court was not *sua sponte* required to give it. *See Bradshaw*, 546 U.S. at 76; *see also Williams*, 52 F.3d at 1480-81.

Second, the Court of Appeal's determination that Quillin suffered no prejudice from defense counsel's failure to request the pinpoint instruction is neither unreasonable nor contrary

17

to Federal law. To demonstrate ineffective assistance of counsel under *Strickland v. Washington*, a defendant must show both that appellate counsel's performance was deficient and that the deficient performance prejudiced his defense. 466 U.S. 668, 687 (1984). A deficient performance is one in which "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* The Supreme Court has explained that, if there is a reasonable probability that the outcome might have been different as a result of a legal error, the defendant has established prejudice and is entitled to relief. *Lafler v. Cooper*, 132 S. Ct. 1376, 1385-86 (2012); *Glover v. United States*, 531 U.S. 198, 203-04 (2001); *Williams*, 529 U.S. at 393-95. An ineffective assistance of counsel claim should be denied if the petitioner fails to make a sufficient showing under either of the *Strickland* prongs. *See Strickland*, 466 U.S. at 697 (courts may consider either prong of the test first and need not address both prongs if the defendant fails on one).

Here, Quillin fails to show prejudice. As the Court of Appeal explained, "[b]y finding [Quillin] guilty of murder, the jury rejected the theory that he was so intoxicated that he did not form the specific intent to kill. It is inconceivable that the jury would have found that he could form the specific intent to commit the crime but determine, based on the same intoxication, evidence that he was too intoxicated to premeditate and deliberate." *Quillin*, 2014 WL 2738849, at *4. Accordingly, Quillin is not entitled to relief on this ground in any event.

## V. CONCLUSION AND ORDER

Quillin is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability. *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)). Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals. *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: March 7, 2018.

                                               /s/James K. Singleton, Jr.
                                               JAMES K. SINGLETON, JR.
                                               Senior United States District Judge